IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

*15008*

TIMOTHY L. BILIOURIS, TIMOTHY L.
BILIOURIS AS NEXT FRIEND OF JADE
N. BILIOURIS, ANNE M. BULLOCK,
BRIAN BULLOCK, ROBERT BULLOCK,
RANDY COUGH, PAT CUMMISKEY,
MICHAEL DOBBS, NATALIE
DONLAVAGE, DOROTHY D. DRISCOLL
AS TRUSTEE FOR THE DOROTHY D.
DRISCOLL DEFINED BENEFIT PENSION
PLAN, DEBORAH EIDENSHINK, JOHN
EIDENSHINK, IRVIN HUSEBY, PAUL S.
KENNEDY, WILLIAM G. LIONETTA, JR.,
WILLIAM G. LIONETTA, JR. AS NEXT
FRIEND OF JACQUELINE C. LIONETTA,
EDITH M. MORROW, GORDON H.
MORROW, MORROW FAMILY, LP, GUY
C. MORROW, THOMAS R. MOTT,
BRADLEY J. MYERS, MARY LYNN
MYERS, ROGER H. NORD, CHARLES
ORTMANN, CHARLES F. SALTER AS
TRUSTEE FOR U/A DTD 12-15-1995,
GILBERT SMALL, ROSALIE J. SMALL,
WILLIAM SPRAGUE, JR. AS TRUSTEE
FOR THE MARY CROWTHER SPRAGUE
TRUST and THE WILLIAM WALLACE
SPRAGUE TRUST MARY CROWTHER
SPRAGUE U/W, AND JAMES A.
YECKLEY, M.D.,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

    Plaintiffs

§
§
§

v.

§
§

SUNDANCE RESOURCES, INC.,
PATMAN DRILLING INTERNATIONAL,
INC., MICHAEL PATMAN, AND DAVID
P. PATMAN,

§
§
§
§
§

    Defendants

§



CIVIL ACTION NO. ____

**3-07 CV 1591-N**

## PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR PRELIMINARY INJUNCTION AND APPLICATION FOR APPOINTMENT OF RECEIVER

TO THIS HONORABLE COURT:

Plaintiffs Timothy L. Biliouris, Timothy L. Biliouris as next friend of Jade N. Biliouris, Anne M. Bullock, Brian Bullock, Robert Bullock, Randy Cough, Pat Cummiskey, Michael Dobbs, Natalie Donlavage, Dorothy D. Driscoll as Trustee for the Dorothy D. Driscoll Defined Benefit Pension Plan, Deborah Eidenshink, John Eidenshink, Irvin Huseby, Paul S. Kennedy, William G. Lionetta, Jr., William G. Lionetta, Jr. as next friend of Jacqueline C. Lionetta, Edith M. Morrow, Gordon H. Morrow, Morrow Family, LP, Guy C. Morrow, Thomas R. Mott, Bradley J. Myers, Mary Lynn Myers, Roger H. Nord, Charles Ortmann, Charles F. Salter as Trustee for U/A DTD 12-15-1995, Gilbert Small, Rosalie J. Small, William Sprague, Jr. as Trustee for the Mary Crowther Sprague Trust and the William Wallace Sprague Trust Mary Crowther Sprague U/W, and James A. Yeckley, M.D., file this Original Complaint, Application for Preliminary Injunction and Application for Appointment of Receiver, complaining of Defendants Sundance Resources, Inc., Patman Drilling International, Inc., Michael E. Patman, and David P. Patman, and as grounds therefore show the Court as follows:

### PARTIES

1.    Timothy L. Biliouris is an individual domiciled in South Dennis, Massachusetts.

2.    Anne M. Bullock is an individual domiciled in Smyrna, Georgia.

3.    Brian Bullock is an individual domiciled in Smyrna, Georgia.

4.    Robert Bullock is an individual domiciled in Arlington, Massachusetts.

5.    Randy Cough is an individual domiciled in Bluffton, South Carolina.

6.    Pat Cummiskey is an individual domiciled in Savannah, Georgia.

7.    Michael Dobbs is an individual domiciled in Savannah, Georgia.

8.    Natalie Donlavage is an individual domiciled in South Dennis, Massachusetts.

9.     Dorothy D. Driscoll, as Trustee for the Dorothy D. Driscoll Defined Benefit Pension Plan, is an individual domiciled in Winchester, Massachusetts.

10.    Deborah Eidenshink is an individual domiciled in Milwaukee, Wisconsin.

11.    John Eidenshink is an individual domiciled in Milwaukee, Wisconsin.

12.    Irvin Huseby is an individual domiciled in Scottsdale, Arizona.

13.    Paul S. Kennedy is an individual domiciled in Winchester, Massachusetts.

14.    William G. Lionetta, Jr., is an individual domiciled in Winchester, Massachusetts.

15.    Edith M. Morrow is an individual domiciled in Albany, California.

16.    Gordon H. Morrow is an individual domiciled in Savannah, Georgia.

17.    Morrow Family, L.P. is a limited partnership organized and existing under the laws of the state of Georgia. Morrow Family, L.P. does not have any general or limited partners who are domiciled in Texas.

18.    Guy C. Morrow is an individual domiciled in Albany, California.

19.    Thomas R. Mott is an individual domiciled in Milwaukee, Wisconsin.

20.    Bradley J. Myers is an individual domiciled in Kewadin, Michigan.

21.    Mary Lynn Myers is an individual domiciled in Kewadin, Michigan.

22.    Roger H. Nord is an individual domiciled in Savannah, Georgia.

23.    Charles Ortmann is an individual domiciled in Savannah, Georgia.

24.    Charles F. Salter is an individual domiciled in Plymouth, Michigan.

25.    Gilbert Small is an individual domiciled in Savannah, Georgia.

26.    Rosalie J. Small is an individual domiciled in Savannah, Georgia.

27.     Williams Sprague, Jr., as Trustee of the Mary Crowther Sprague Trust and the William Wallace Sprague Trust Mary Crowther Sprague U/W, is an individual domiciled in Savannah, Georgia.

28.     James A. Yeckley, M.D., is an individual domiciled in Savannah, Georgia.

29.     Defendant Sundance Resources, Inc. (hereafter, "Sundance") is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located in Rio Vista, Johnson County, Texas.  Sundance may be served through its registered agent for service of process, David P. Patman, 201 North Highway 174, Rio Vista, Texas 76093.

30.     Defendant Patman Drilling International, Inc. (hereafter, "Patman Drilling") is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located in Rio Vista, Johnson County, Texas.  Patman Drilling may be served through its registered agent for service of process, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, Texas, 78701.

31.     Defendant Michael E. Patman is an individual domiciled in Hill County, Texas. He may be served at his residence, 318 FM 2488, Covington, Hill County, Texas, 76636, or at any other place where he may be found within the State.

32.     Defendant David P. ("Pat") Patman is an individual domiciled in Johnson County, Texas.  He may be served at his residence, 1201 E. F.M. 916, Rio Vista, Johnson County, Texas 76093, or at any other place where he may be found within the State.

**JURISDICTION AND VENUE**

33.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a).  All of the Defendants reside in Texas, but none of the Plaintiffs does.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  Accordingly, diversity jurisdiction exists.

34.     This Court has personal jurisdiction over Sundance because Sundance is a Texas corporation and regularly transacts business in the State of Texas.   The Court has personal jurisdiction over Patman Drilling because Patman Drilling is a Texas corporation and regularly transacts business in the State of Texas.   The Court has personal jurisdiction over Michael E. Patman and David P. Patman because they are individuals who reside in Texas.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because all of the Defendants reside in the same state, and at least one Defendant resides in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## SUMMARY OF THE ACTION

36.     Plaintiffs are individuals (many of whom are retirees) who loaned an aggregate of $14,629,500 million to Sundance for the purchase of oil and gas rigs to be used for drilling wells in the Barnett Shale.  Plaintiffs were induced to make these loans by Sundance and its principals, including Michael E. Patman and David P. ("Pat") Patman, who represented to Plaintiffs that the loan proceeds would be used by Sundance solely to purchase drilling rigs, that the principal amount of the loans would be repaid in full, and that Plaintiffs would be given carried working interests in wells drilled by the rigs financed by the loan proceeds.   After collecting the loan proceeds from Plaintiffs, however, Sundance commenced a scheme whereby it transferred the rigs acquired with the loan proceeds to Patman Drilling, guaranteed a $28 million bank loan to Patman Drilling secured by the rigs, and made cash advances to Patman Drilling using the loan proceeds.   Moreover, in late 2006, Michael E. and David P. Patman, who are Sundance insiders, took approximately $4 million in cash from Sundance while the company was insolvent. Sundance and the Patmans have since repudiated the loans, and have not repaid the loan

principal nor conveyed to Plaintiffs virtually any of the carried working interests that they were promised.

37.     Plaintiffs bring this lawsuit to enjoin further disposition of the assets of Sundance, to void previous fraudulent transfers of those assets, and to request that a receiver be appointed to administer Sundance's estate.  Sundance did not receive reasonably-equivalent value for its transfers of the drilling rigs or the cash advances to its affiliates and insiders.  These transfers have rendered Sundance insolvent and unable to repay Plaintiffs.  Further, Sundance has failed to grant Plaintiffs carried working interests in virtually all of the wells that it has drilled with the subject rigs.  An injunction is necessary to stop Sundance, Patman Drilling, and the Patmans from further disposing of or encumbering assets, to attach the fraudulently-transferred assets or the value of such assets now in the possession of Patman Drilling and the Patmans, and/or to void those insider transactions.  A receiver is necessary to administer the unraveling of those transactions and to protect Sundance's estate.

38.     Plaintiffs also seek specific performance of their loan agreements with Sundance (including repayment of principal and the granting of the carried working interests that they are owed), damages, and attorneys' fees.  In the alternative, Plaintiffs ask the Court to rescind their loans to Sundance and restore the parties to the status quo ante.  Among other things, rescission is available here because Sundance offered Plaintiffs carried working interests in oil wells in violation of the Texas Securities Act.  The Texas State Securities Board has already issued a cease and desist order to Sundance and Michael E. Patman finding them in violation of the Act for offering and selling the carried working interests without first registering them and as non-dealers.

## FACTS

39.    The factual allegations supporting Plaintiffs' request for a preliminary injunction and application for appointment of a receiver are contained in the Declaration of William G. Lionetta, Jr., attached hereto as Exhibit A.  Plaintiffs incorporate the Lionetta Declaration in full by reference as if fully set forth herein.

### A.    The Nature of the Rig Bank Loans

40.    Defendant Sundance is, ostensibly, engaged in the business of acquiring and developing oil and gas leases.  Defendants Michael E. Patman and David P. Patman are the founding shareholders and only two directors of Sundance.   Upon information and belief, Michael E. Patman and David P. Patman are also the sole shareholders and directors of Defendant Patman Drilling.

41.    Beginning in 2004, Sundance and the Patmans solicited Plaintiffs' participation in a series of financing programs, which Sundance labeled "loans" (hereinafter referred to as the "Rig Bank Loans"), the proceeds from which were to be used by Sundance to purchase drilling rigs for its use in oil and gas drilling operations in the Barnett Shale.  Sundance provided Plaintiffs with prospectuses and draft contracts that represented that participants in the Rig Bank Loans were guaranteed repayment in full of the loan principal without monthly bank interest but, rather, with a 0.50 percent carried working interest in each well drilled using the drilling rigs acquired through the Rig Bank Loans.

42.    Sundance also invited and paid for several of Plaintiffs to fly to Dallas to tour Sundance's offices in Irving and Rio Vista and to view, via helicopter, Sundance's purported drilling operations in the Barnett Shale.  Sundance's officers, including Executive Vice President Kirk Johnson and Chief Operating Officer defendant David P. "Pat" Patman, orally represented to Plaintiffs during these trips that repayment of any principal loaned to Sundance through the

Rig Bank Loans was guaranteed, and that the carried working interests that Plaintiffs would receive in lieu of bank interest would be extraordinarily profitable for Plaintiffs. Sundance's officers explained that they had established the Rig Bank Loan programs because of the low loan-to-value ratio at which banks were willing to finance drilling rigs. They said that Sundance instead wanted to finance the rigs through private loans which they had set-up through the Rig Banks. When Plaintiffs inquired as to how safe their loan principal would be, Mr. Johnson responded in each instance that there was essentially no risk in the Rig Bank Loan repayments. He stated that short of a natural disaster, corporate bankruptcy, or even acts of terrorism, the loan principal was safe and repayment was guaranteed.

43.     Throughout 2004, 2005, and 2006, Sundance established a total of five Rig Banks Loans, numbered 1, 2, 3, 4, and 6 (there is no Rig Bank Loan #5). For Rig Bank Loans 1, 2, and 3, Plaintiffs were invited to advance increments of $500,000 (one "Unit") to Sundance for its purchase of one high-quality drilling rig per Rig Bank. For Rig Bank Loans 4 and 6, Plaintiffs were invited to advance increments of $650,000 (one Unit), again for the purchase of one high-quality drilling rig per Rig Bank. Plaintiffs, individually, lent money to Sundance in varying amounts representing single, multiple, and sometimes fractional Units. The Units that Plaintiffs advanced represent debt obligations by Sundance to repay the loan principal in full without monthly bank interest but, rather, with a 0.50 percent carried working interest in each well drilled using the rigs acquired through the Rig Bank Loans.

44.     The Rig Bank Loans are memorialized in Participation Agreements that include and incorporate by reference a separate Letter Agreement (collectively, "the Rig Bank Loan Agreements"). The Rig Bank Loan Agreements provide that the Unit proceeds are loaned to Sundance and that the proceeds of each loan are to be utilized by Sundance solely for its



purchase of a specific drilling rig (assigned a number, *e.g.*, "Drilling Rig #4"). The Rig Bank Loan Agreements obligate Sundance to repay in full the principal amount of each loan through partial repayments on a per Unit basis each time that the drilling rig funded by that Rig Bank Loan is used to drill a "Program Well." The Rig Bank Loan Agreements define "Program Well" as any oil and/or gas well drilled by Sundance or any other operator, in any county in any state, using the particular drilling rig funded by that Unit at any time prior to the repayment of all principal. The Rig Bank Loan Agreements expressly provide that the term "drilled," as used in the definition of "Program Well," means the commencement of drilling activities (*i.e.*, spudding of the well), "regardless of when drilling is completed or when the well is completed." In other words, the Rig Bank Loan Agreements obligate Sundance to make partial principal repayments each time that a Program Well is drilled, regardless of whether the well is completed or whether it produces paying quantities, until the entire loan principal is repaid.

45.      The Rig Bank Loan Agreements also provide that each Unit loaned by Plaintiffs entitles them to receive a 0.50 percent carried working interest in each Program Well as soon as it is drilled. For Rig Bank Loan #6, the Rig Bank Loan Agreement provides that if no carried working interest can be delivered, cash will be paid in lieu thereof.

**B.      Sundance Defaults**

46.      The first Rig Bank Loan, Rig Bank Loan #1, consisted of 10 Units representing loans of $500,000 each. A rig, Drilling Rig #1, was acquired using those loans. Drilling Rig #1 drilled a total of eleven wells. As each of the first ten wells in Rig Bank Loan #1 was drilled, Sundance made principal repayments to the Rig Bank lenders of $31,250 per Unit. After the eleventh well was drilled in May 2006, Sundance repaid the remaining balance of each loan, approximately $187,500 per Unit, thus satisfying its principal repayment obligations under the

terms of Rig Bank Loan #1. Sundance also granted carried working interests to the lenders in Rig Bank Loan #1 as promised.

47.     Since Rig Bank Loan #1, however, Sundance has failed to pay Plaintiffs all of the principal installments that they are due and has failed to convey carried working interests in virtually all of the wells that it has drilled.

Rig Bank Loan #2

48.     Rig Bank Loan #2 included loan Units of $500,000 each. Under the Rig Bank Loan Agreement for Rig Bank Loan #2, Sundance was obligated to make a partial principal repayment of at least $20,000 per Unit and grant a carried working interest of 0.50 percent per Unit each time that a Program Well was drilled. The last information provided by Sundance, which was in February 2007, indicated that Drilling Rig #2 (acquired with funds loaned to Sundance under Rig Bank Loan #2) had been used to drill five wells. Upon information and belief, Sundance has drilled at least an additional two wells using Drilling Rig #2 since February 2007.

49.     Sundance has made partial principal repayments on only four wells drilled using Drilling Rig #2. Sundance has conveyed carried working interests to the Unit lenders in only two of those wells. Sundance is therefore currently obligated to each Unit lender under Rig Bank Loan #2 in the minimum amount of $20,000. If, as Plaintiffs believe, there have been two additional wells drilled since February 2007, then Sundance owes the Unit lenders in Rig Bank Loan #2 an additional $40,000. In addition, Sundance is obligated immediately to convey the carried working interests in the remainder of the wells drilled using Drilling Rig #2.

Rig Bank Loan #3

50.     Rig Bank Loan #3 included loan Units of $500,000 each. Under the Rig Bank Loan Agreements for Rig Bank Loan #3, Sundance was obligated to make a partial principal

-10-

repayment of at least $20,000 per Unit and grant a carried working interest of 0.50 percent per Unit each time that a Program Well was drilled. The last information provided by Sundance, which was in February 2007, indicated that five wells had been drilled under Rig Bank Loan #3.

51. Sundance has made partial principal repayments on only three of the five wells drilled. Sundance has not conveyed any carried working interests to the Unit lenders in any of the five wells drilled in Rig Bank Loan #3. Sundance is therefore currently obligated to each Unit lender under Rig Bank Loan #3 in the minimum amount of $40,000. In addition, Sundance is obligated immediately to convey the carried working interests in all five wells as required by the Rig Bank Loan Agreements.

Rig Bank #4

52. Rig Bank Loan #4 included loan Units of $650,000 each. Under the Rig Bank Loan Agreements for Rig Bank Loan #4, Sundance was obligated to make a partial principal repayment of at least $25,000 per Unit and grant a carried working interest of 0.50 percent per Unit each time that a Program Well was drilled. The last information provided by Sundance, which was in February 2007, indicated that five wells had been drilled under Rig Bank Loan #4.

53. Sundance has made partial principal repayments on only two of the five wells drilled. Sundance has not conveyed any carried working interests to the Unit lenders in any of the five wells drilled in Rig Bank Loan #4. Sundance is therefore currently obligated to each Unit lender under Rig Bank Loan #4 in the minimum amount of $75,000. In addition, Sundance is obligated immediately to convey the carried working interests in all five wells as required by the Rig Bank Loan Agreements.

Rig Bank Loan #6

54. Rig Bank Loan #6 included loan Units of $650,000 each. Under the Rig Bank Loan Agreements for Rig Bank Loan #6, Sundance was obligated to make a partial principal



repayment of at least $25,000 per Unit and grant a carried working interest of 0.50 percent per Unit, or pay cash in lieu thereof, each time that a Program Well was drilled. The last information provided by Sundance, which was in February 2007, indicated that two wells had been drilled under Rig Bank Loan #6.

55.     Sundance has not made any partial principal repayments on either of the two wells drilled using Drilling Rig #6. Sundance has not conveyed any carried working interests to the Unit lenders in either of the two wells. Sundance is therefore currently obligated to each Unit lender under Rig Bank Loan #6 in the minimum amount of $50,000. In addition, Sundance is obligated immediately to convey the carried working interests in both wells as required by the Rig Bank Loan Agreements.

## C.     Defendants Siphon Sundance's Assets

56.     As Sundance began falling behind on principal repayments, Plaintiffs began investigating and pressing Sundance for information about the use of their loaned funds and Sundance's drilling and exploration activities. Throughout March, April, and May 2007, Plaintiffs had at least weekly conversations with persons at Sundance about the status of principal repayment. Sundance repeatedly assured Plaintiffs that payments were forthcoming.

57.     In May 2007, Sundance announced that that Shell Oil Company and Mesa Petroleum had terminated their joint ventures with Sundance. Sundance did not give a reason for the termination but nevertheless assured Plaintiffs that the next principal payment would be in May or June 2007 because Sundance was working to obtain restructuring financing. By mid-June, however, Sundance informed the Rig Bank lenders that a tentative date for principal repayment could not be given because Sundance had been yet unable to replace Shell and Mesa.

58.     Over the course of the next couple of months, Plaintiffs learned that Sundance had transferred the rigs that were purchased through the Rig Bank Loans to Patman Drilling, and that

Patman Drilling had pledged them to Merrill Lynch for approximately $28 million and was defaulting on those payments. Plaintiffs also learned that Sundance had loaned money or made cash advances to Patman Drilling, that Sundance owed approximately $500,000 to PJ Services, a company owned by Michael Patman's son, for purported water hauling services, that Sundance had sold its interest in a pipeline for approximately half its value in a fire sale, and that Sundance had guaranteed the $28 million loan from Merrill Lynch to Patman Drilling.

59.     Defendants' fraudulent scheme has predictably brought Sundance to the brink of financial disaster. While Defendants have been stripping Sundance of its assets Sundance has been accumulating vast amounts of unpaid debt to vendors and co-venturers in its drilling programs. At present, and for some time, Sundance has been unable to meet its financial obligations and pay its debts as they come due, rendering it insolvent. Despite creating the insolvency, Defendants have continued to transfer monies and perhaps other assets to themselves or their affiliated companies, and to incur obligations for Sundance, including a guarantee of the line of credit to Patman Drilling secured by the rigs purchased with Plaintiffs' loans. In addition, because of its inability to meet its financial obligations, Sundance is close to losing its interest in a number of the Program Wells drilled using rigs acquired with Plaintiffs' Rig Bank Loan proceeds, wells in which Plaintiffs are entitled to receive, but have not been provided, carried working interests.

60.     Plaintiffs have further learned that, even as Defendants continued to solicit loans and accept funds from Plaintiffs and other Unit lenders in the fraudulent Rig Bank programs, Sundance and the individual Defendants were under cease and desist orders from at least three states, including Texas, prohibiting them from continuing to engage in unlawful solicitations identical or similar to the Rig Bank programs foisted upon Plaintiffs. The Texas State Securities



Board found Sundance and Michael E. Patman to be in violation of several provisions of the Texas Securities Act, specifically for offering to sell and selling carried working interests without registering them. Sundance and the individual Defendants continued to take Rig Bank Loan funds after the issuance of the cease and desist order from the State of Texas.

61.     In short, Defendants engaged in a brazen scheme to induce Plaintiffs to loan them money on promises which they now deny having ever made and in exchange for obligations which they now deny any duty to perform. They are systematically working to cement their fraud by placing beyond Plaintiffs' reach anything of value that might be used to satisfy those obligations and make Plaintiffs whole for the financial harm done to them. Plaintiffs have been forced to bring this action to put a stop to Defendants' scheme and recoup their losses.

## CAUSES OF ACTION

### Count One: Preliminary and Permanent Injunctive Relief, Appointment of Receiver, and Damages Under Texas Business & Commerce Code § 24.001, et seq. (All Defendants)

62.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Plaintiffs seek the issuance of a Preliminary Injunction to prevent the further disposition or encumbrance of the assets of Sundance, including the assets that it has already transferred to its affiliate, Patman Drilling, and insiders Michael E. and David P. Patman, for less than reasonably-equivalent value and with knowledge that its remaining assets would not be enough to meet its obligations under the Rig Bank Loan Agreements and/or with actual intent to defraud Plaintiffs. Plaintiffs are likely to prevail on the merits. The relief requested herein will preserve the status quo because it will prevent the further disposition or encumbrance of Sundance's assets.

63.     If the Plaintiffs' application for a Preliminary Injunction is not granted, harm to Plaintiffs is imminent and irreparable. If Sundance is allowed to continue to transfer its assets in

fraud of the Plaintiffs while it is already unable to pay its debts as they become due or continue with drilling activity for lack of liquidity, Plaintiffs will be left without an adequate remedy at law. Plaintiffs believe that this harm is imminent. Plaintiffs have been engaged in settlement discussions with Defendants over the last several weeks, but, at the last meeting, Michael E. Patman failed to appear after agreeing to the meeting time and place and requiring Plaintiffs' counsel to travel from Houston to Dallas. Upon information and belief, this stalling tactic was orchestrated to allow Defendants additional time to rid Sundance of any ability to repay Plaintiffs.

64.     The injury faced by Plaintiffs outweighs any injury that would be suffered by Defendants as the result of preliminary injunctive relief. The granting of preliminary injunctive relief, as set forth below, will not adversely affect public policy or the public interest.

65.     Plaintiffs are creditors of Defendant Sundance and have claims against Defendant Sundance for unpaid amounts due and owing under the Rig Bank lending scheme perpetrated by Sundance and the other Defendants to this action. After or within a reasonable time before said claims arose, Sundance transferred its assets and/or incurred obligations to Defendants Patman Drilling, Michael E. Patman, and David P. Patman with the actual intent to hinder, delay, or defraud Plaintiffs. In addition, Sundance made said transfers or incurred said obligations without receiving a reasonably-equivalent value in exchange for the transfer or obligation, and Sundance was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction. In addition, Sundance made said transfers or incurred said obligations without receiving a reasonably-equivalent value in exchange for the transfer or obligation, and Sundance intended to incur, or believed or



reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

66.     Further and in the alternative, Sundance made transfers or incurred obligations to the other Defendants in this case after Plaintiffs' claims arose, and did so without receiving a reasonably-equivalent value in exchange for the transfer or obligation, and Sundance was insolvent at that time, or became insolvent as a result of the transfer or obligation. In addition, Sundance made transfer or incurred obligations to insiders, including Michael E. Patman, David P. Patman, and PJ Services, a company owned by Defendant Michael E. Patman's son, for an antecedent debt, at a time when Sundance was insolvent, and when Defendants Michael E. Patman and David P. Patman had reasonable cause to believe that Sundance was insolvent.

67.     As a result of these fraudulent transfers and obligations, Plaintiffs have suffered actual harm and are entitled to avoidance of all such transfers or obligations, attachment and receivership against the monies and other assets transferred (as set forth below), and monetary damages against Defendants Patman Drilling, Michael E. Patman, and David P. Patman, jointly and severally.

68.     Plaintiffs are willing to post a bond in an appropriate amount.

69.     Given the harm that that will occur if an injunction is not issued, Plaintiffs respectfully request that the Court issue a preliminary and permanent injunction as follows:

      a.     Enjoining Defendants from further disposing of or encumbering any assets of Sundance, including assets that Defendants Patman Drilling, Michael E. Patman, or David P. Patman have received from Sundance;

      b.     Enjoining Defendants from causing or inducing any third-party to dispose of or encumber any assets of Sundance, including assets that Defendants Patman Drilling, Michael E. Patman, or David P. Patman have received from Sundance;

c.    Appointing a receiver to take charge of the assets transferred or other property of Defendants Sundance, Patman Drilling, Michael E. Patman, and David P. Patman;

d.    Ordering that any transfer of assets that Sundance made or obligation that Sundance incurred to Defendants Patman Drilling, Michael E. Patman, or David P. Patman, after or within a reasonable time before Plaintiffs' claims arose, with the actual intent to hinder, delay, or defraud Plaintiffs is void;

e.    Ordering that any transfer of assets that Sundance made or obligation that Sundance incurred, without receiving reasonably-equivalent value in exchange for the transfer or obligation while Sundance was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction, is void;

f.    Ordering that any transfer of assets that Sundance made or obligation that Sundance incurred, without receiving reasonably-equivalent value in exchange for the transfer or obligation when Sundance intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due, is void;

g.    Ordering that any transfer of assets that Sundance made or obligation that Sundance incurred after Plaintiffs' claims arose, without receiving reasonably-equivalent value in exchange for the transfer or obligation at a time when Sundance was insolvent or became insolvent as a result of the transfer or obligation, is void;

h.    Ordering that any transfer of assets that Sundance made or obligation that Sundance incurred to insiders, including Defendants Michael E. Patman and David P. Patman, for an antecedent debt, at a time when Sundance was insolvent and when Defendants Michael E. Patman and David P. Patman had reasonable cause to believe that Sundance was insolvent, is void; and

i.    Attaching and ordering that Defendants Patman Drilling, Michael E. Patman, and David P. Patman return any assets transferred in any transaction voided per sections (a)-(h), above.

**Count Two: Breach of Contract (As to Defendant Sundance)**

70.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Plaintiffs, individually, entered into separate valid and enforceable contracts with Sundance, and Plaintiffs are proper parties to sue for the enforcement of those contracts.

Plaintiffs fully performed all of their obligations under those contracts by loaning Sundance an aggregate of $14.63 million under the various Rig Bank Loan Agreements. All conditions precedent to Sundance's performance under the contracts have been performed or have occurred. Nevertheless, Sundance has breached the various Rig Bank contracts by: (1) failing to make partial repayments of principal to Plaintiffs each time that the various drilling rigs were used to drill Program Wells; (2) failing to convey a 0.50 percent carried working interest per Unit for each of Program Well drilled; and (3) failing to utilize the loans from Plaintiffs solely to acquire the drilling rigs. These breaches of Sundance's contractual obligations have been the cause of actual damages to Plaintiffs.

### Count Three: Common Law Fraud (As to Defendants Sundance, Michael E. Patman, and David P. Patman)

71. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Defendants Sundance, Michael E. Patman, and David P. Patman each and collectively made representations to Plaintiffs concerning the Rig Bank Loan scheme that were both material and false. They represented (through prospectuses, Letter Agreements, Participation Agreements, correspondence, and oral communications) that the money provided to Sundance by Plaintiffs were loans that would be treated as general unsecured claims of Sundance and would be repaid in full, that Plaintiffs would be granted carried working interests in each Program Well, that Sundance's financial state was significantly better than it was, and that Sundance's wells were profitable. Defendants made these representations either directly to Plaintiffs, or to a third party with the intent or expectation that they would be repeated to Plaintiffs. Defendants' misrepresentations included false statements of fact, opinions which Defendants knew to be false or based upon false facts, and promises of future performance with no present intention of performing. Defendants made these misrepresentations knowing they



were false, or made them recklessly and as a positive assertion without knowledge of their truth. Defendants made these representations with the intent that Plaintiffs rely on them, and Plaintiffs did in fact rely on Defendants' misrepresentations. Plaintiffs have suffered actual injury as a result and are entitled to actual and punitive damages. In the alternative, as a result of Defendants' fraud, Plaintiffs are entitled to rescission of their contracts with Sundance.

### Count Four: Statutory Fraud Under Texas Business & Commerce Code §27.01 (As to Defendant Sundance)

72.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Plaintiffs entered into a contract with Defendant Sundance involving real estate, specifically, a contract to convey to Plaintiffs a 0.50 percent (per Rig Bank Unit) carried working interest in each Program Well, Defendant Sundance made false representations of fact and false promises for the purpose of inducing Plaintiffs to enter into a contract, as set out more specifically above. Plaintiffs relied on the false representations and promises by entering into the contract, and that reliance has caused Plaintiffs actual injury. Sundance had actual knowledge of the falsity of the facts and promises, and Plaintiffs are therefore entitled to exemplary damages. Further and in the alternative, monetary damages would be inadequate to compensate Plaintiffs for the injury suffered as a result of Sundance's fraud, and Plaintiffs are therefore entitled to specific performance of the contract requiring Sundance to convey the promised carried working interests to Plaintiffs.

### Count Five: Negligent Misrepresentation (As to Defendants Sundance, Michael E. Patman, and David P. Patman)

73.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Defendants Sundance, Michael E. Patman, and David P. Patman each and collectively made representations to Plaintiffs concerning the Rig Bank program in the course of



their business or in transactions in which they had an interest.    Specifically, Defendants represented that the monies provided by Plaintiffs would be loans and treated as general unsecured claims of Sundance. Defendants supplied false information for the guidance of others, including Plaintiffs, in connection with those representations.    Defendants did not exercise reasonable care or competence in obtaining or communicating the information.    Plaintiffs justifiably relied on the representations by Defendants, and Defendants' negligent misrepresentations proximately caused pecuniary loss to Plaintiffs.

<b>Count Six:    Unjust Enrichment (All Defendants)</b>

74.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Defendants, individually and collectively, have been unjustly enriched by receiving and using funds loaned by Plaintiffs as part of the Rig Bank scheme while giving no consideration or value to Plaintiffs in return for the use of those funds. Plaintiffs are therefore entitled to compensation to the extent Defendants' benefit exceeds the complete lack of consideration received by Plaintiffs.

<b>Count Seven:  Civil Conspiracy (All Defendants)</b>

75.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Defendants were each a member of a combination of two or more persons, the object of which was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.  Defendants had a meeting of the minds on the object or course of action of the combination, and one or more of them engaged in one or more unlawful, overt acts to further the object or course of action, as set out above. Plaintiffs suffered injury as a proximate result of the wrongful acts of the Defendants in furtherance of the conspiracy, and Defendants are jointly and severally liable for Plaintiffs' injury.

### Count Eight: Vicarious Liability: Aiding And Abetting (All Defendants)

76.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  One or more of the Defendants committed a tort, as set out above.  The other Defendants had knowledge that said conduct constituted a tort, had the intent to assist in committing the tortious conduct, and gave assistance or encouragement in the commission of the tortious conduct.  Defendants' assistance and encouragement was a substantial factor in causing the tort.  Further and in the alternative, one or more Defendants provided substantial assistance to the others in activity that accomplished a tortious result, and said conduct was independently a breach of duty to Plaintiffs.  Said conduct was a substantial factor in causing the tortious conduct and the resulting injury to Plaintiffs.

### Count Nine:  Vicarious Liability:  Joint Enterprise (All Defendants)

77.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  Defendants were engaged in a joint enterprise in that they had an express or implied agreement in connection with the Rig Bank scheme perpetrated by Defendants, shared a common purpose to be carried out by the enterprise, shared a community of pecuniary interest in that common purpose, and had an equal right to direct and control the enterprise.  One or more of the Defendants committed a tort against Plaintiffs, as set out above, while acting within the scope of the enterprise.  All of the Defendants are therefore vicariously liable to Plaintiffs for the injuries suffered as a result.

### Count Ten: Vicarious Liability: Alter-Ego (All Defendants)

78.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  The corporate distinctions between Defendants Sundance, Patman Drilling, Michael E. Patman, and David P. Patman should be disregarded because the corporate form of



Sundance was used as a sham to perpetrate a fraud; because Sundance was organized and operated as a mere tool or business conduit of Defendants Michael E. Patman, David P. Patman, and Patman Drilling; because the corporate form is being used to evade existing legal obligations; and Sundance was inadequately capitalized so as to work an injustice to Plaintiffs; and/or Sundance and Patman Drilling were operated as a single business enterprise. Further and in the alternative, Defendants Michael E. Patman and David P. Patman, acting individually and through Patman Drilling, caused Sundance to be used for the purpose of perpetrating an actual fraud on Plaintiffs, as set out above, and did so primarily for their direct personal benefit.

### Count Eleven: Violation of Texas Securities Act
### (As to Defendants Sundance and Michael E. Patman)

79.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.    Defendants Sundance and Michael E. Patman offered or sold securities (specifically, carried working interests in oil and gas wells) to Plaintiffs in violation of Sections 7 and 12 of the Texas Securities Act and an order under Section 23A of the Texas Securities Act. Plaintiffs are thus entitled to rescission of the Rig Bank Loans, in the alternative.

### MONETARY DAMAGES

80.     Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  As a result of the foregoing conduct by Defendants, each Plaintiff has suffered monetary damages in an amount above the jurisdictional minimum of this Court, for which Plaintiffs now sue, including but not limited to: (1) the unpaid amounts due and owing under the Rig Bank contracts for Program Wells drilled with rigs funded by Plaintiffs through the Rig Bank scheme; (2) the fair market value of Plaintiffs' share of the working interests on all wells drilled using rigs funded by Plaintiffs through the Rig Bank scheme; (3) the unpaid balance on Rig Bank Loans funded by Plaintiffs, measured as the cost of Rig Bank units purchased by



Plaintiffs less the amounts re-paid by Sundance on each unit; and (4) consequential damages represented by the time-value of Plaintiffs' money loaned to Sundance.

81. In addition, the Defendants' conduct as set out above constitutes fraud as that term is defined in TEX. CIV. PRAC. & REM. CODE § 41.001 *et seq.*, and entitles Plaintiffs to exemplary damages to punish or deter Defendants from such conduct in the future, in the maximum amount allowed by law.

## SPECIFIC PERFORMANCE

82. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Further and in the alternative, Defendants' breach of contract entitles Plaintiffs to specific performance of Defendants' obligation to convey Plaintiffs' share of the carried working interests in all wells drilled using rigs funded by Plaintiffs through Defendants' Rig Bank scheme. Plaintiffs had valid and enforceable contracts with Defendant Sundance and the contract terms were clear enough that the parties knew their obligations. Moreover, the contract furnished the means by which the real property interests in question could be identified with reasonable certainty. Plaintiffs did not repudiate or materially breach the contracts and have clean hands in the transaction. Therefore, Plaintiffs are entitled to specific performance of Defendants' obligation to transfer the carried working interests.

## ATTORNEYS' FEES

83. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein. Defendants have failed and refused to perform their obligations or compensate Plaintiffs for their losses, and as a result Plaintiffs have been required to retain the services of the undersigned attorneys to protect their interests and pursue their claims. Therefore, Plaintiffs are entitled to recover their reasonable and necessary attorneys fees incurred in bringing this action.

**APPLICATION FOR APPOINTMENT OF RECEIVER (as to Defendant Sundance)**

84.    Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  Plaintiffs seek the appointment of a receiver pursuant to Section 24.008 of the Texas Business & Commerce Code, Article 7.05 of the Texas Business Corporations Act, Chapter 64 of the Texas Civil Practice & Remedies Code, and Rule 66 of the Federal Rules of Civil Procedure, to rehabilitate Sundance on the grounds below.

85.    The appointment of the receiver sought by this Complaint is necessary to conserve the assets and business of Sundance, and to avoid damage to the Plaintiffs.  Defendants have been systematically stripping Sundance of its assets, including orchestrating an inter-company loan to Defendant Patman Drilling of the funds received from Plaintiffs and $4 million in cash paid to the individual Defendants for "services," the nature of which is not known to Plaintiffs.  While Defendants continue to transfer money and perhaps other assets to themselves or their affiliated companies, Sundance has been accumulating vast amounts of unpaid debt.

86.    At present, and for some time, Sundance has been unable to meet its debts as they become due in the ordinary course of its business.  All or virtually all of Sundance's indebtedness is now past due, and Sundance has practically no cash resources and no assets that can readily be converted into cash to pay its debts.

87.    Sundance is indebted to Plaintiffs in the sum of $12,102,500.  Sundance has admitted, in writing, that this debt is due and owing to Plaintiffs.

88.    As a result of the foregoing, Plaintiffs bring this action for the purpose of having a receiver appointed for the assets and business of Defendant in order to bring about a business entity rehabilitation.  All other requirements of the law have been satisfied.

89.     Plaintiffs submit that an independent third party that the Court deems qualified, should be appointed operating receiver of the assets and business of Sundance with such powers as are provided by laws of general applicability relating to receivers and such other powers deemed appropriate by the Court to accomplish the corporate rehabilitation.

90.     Therefore, Plaintiffs are entitled to a judgment appointing an independent third party that the Court deems qualified, as receiver of all of the assets and business of Sundance, with the powers described above.  Plaintiffs are also entitled to an order determining the amount and terms of the bonds of the applicant and the receiver.

**PRAYER**

WHEREFORE, Plaintiffs ask that Defendants be cited to answer and appear herein, and that Plaintiffs have the relief requested herein as well as their attorneys' fees as allowed by law, pre- and post-judgment interest at the maximum legal rate, and costs of suit, together with such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,


/s/ Tracie Renfroe
KING & SPALDING LLP
Tracie Renfroe
Texas State Bar No. 16777000
Alissa B. Rubin
Texas State Bar No. 24037404 (Northern
District admission pending)
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
E-mail: TRenfroe@kslaw.com





CROUCH & RAMEY, LLP
Hubert A. Crouch, III
Texas State Bar No. 05148500
Kirk Florence
Texas State Bar No. 07160900
1445 Ross Ave. #3600
Dallas, Texas 75202
Telephone: (214) 725-4419
Facsimile: (214) 922-7101
E-mail: hcrouch@crouchfirm.com

COUNSEL FOR PLAINTIFFS



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TIMOTHY L. BILIOURIS, TIMOTHY L. BILIOURIS AS NEXT FRIEND OF JADE N. BILIOURIS, ANNE M. BULLOCK, BRIAN BULLOCK, ROBERT BULLOCK, RANDY COUGH, PAT CUMMISKEY, MICHAEL DOBBS, NATALIE DONLAVAGE, DOROTHY D. DRISCOLL AS TRUSTEE FOR THE DOROTHY D. DRISCOLL DEFINED BENEFIT PENSION PLAN, DEBORAH EIDENSHINK, JOHN EIDENSHINK, IRVIN HUSEBY, PAUL S. KENNEDY, WILLIAM G. LIONETTA, JR., WILLIAM G. LIONETTA, JR. AS NEXT FRIEND OF JACQUELINE C. LIONETTA, EDITH M. MORROW, GORDON H. MORROW, MORROW FAMILY, LP, GUY C. MORROW, THOMAS R. MOTT, BRADLEY J. MYERS, MARY LYNN MYERS, ROGER H. NORD, CHARLES ORTMANN, CHARLES F. SALTER AS TRUSTEE FOR U/A DTD 12-15-1995, GILBERT SMALL, ROSALIE J. SMALL, WILLIAM SPRAGUE, JR. AS TRUSTEE FOR THE MARY CROWTHER SPRAGUE TRUST and THE WILLIAM WALLACE SPRAGUE TRUST MARY CROWTHER SPRAGUE U/W, AND JAMES A. YECKLEY, M.D., | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Plaintiffs | § § | CIVIL ACTION NO. ____ |
| v. | § § | |
| SUNDANCE RESOURCES, INC., PATMAN DRILLING INTERNATIONAL, INC., MICHAEL PATMAN, AND DAVID P. PATMAN, | § § § § § | |
| Defendants | § | |

## DECLARATION OF WILLIAM G. LIONETTA, JR.

Exhibit A

COMMONWEALTH OF MASSACHUSETTS            §
                                         §
COUNTY OF MIDDLESEX                      §

1.      I, William G. Lionetta, Jr., am over the age of twenty-one and am competent to
make this Declaration. I am making this Declaration in support of Plaintiffs' application for a
preliminary injunction and appointment of a receiver in the above-styled case. The facts set forth
in this Declaration are based on my personal knowledge and on the documents attached hereto
and are true and correct to the best of my ability.

### Rig Bank Loan Program #4

2.      I first learned of Sundance Resources, Inc. (hereinafter "Sundance") in early
February 2006. A family member, Brian Bullock, gave me, through Gordon Morrow his father-
in-law, the contact information for Kirk Johnson, Executive Vice President for Sundance. I
contacted Kirk Johnson by telephone, and he said that he would send me materials about the
then-currently open rig bank, Rig Bank #4. In late February, I received from Mr. Johnson via
Federal Express a copy of the Rig Bank #4 prospectus. A true and correct copy of the Rig Bank
#4 prospectus is attached hereto as Exhibit 1. Shortly thereafter, Mr. Johnson sent me a Letter
Agreement and Participation Agreement for Rig Bank #4. A true and correct copy of the Letter
Agreement and Participation Agreement that Mr. Johnson sent me is attached hereto as Exhibit
2.

3.      I understood from the prospectus, Letter Agreement, and Participation
Agreement, as well as additional telephone conversations that I had with Mr. Johnson throughout
the month of February and early March of 2006, that lenders such as myself were invited to
advance increments of $650,000 (one "Unit") to Sundance to acquire one high-quality drilling

rig, in this case Drilling Rig #4. There were to be 10 Units for Rig Bank #4. I always understood that the nature of this transaction was that of a loan.

4.      I also understood from the prospectus, Letter Agreement, Participation Agreement and my telephone conversations with Mr. Johnson, that the principal of the loan would be repaid in full, with partial principal payments to be made each time that Drilling Rig #4 was used to drill a "Program Well." The Letter Agreement for Rig Bank #4 defined "Program Well" as "an oil and/or gas well having all of the following characteristics: (i) drilled by SRI (or any other operator), (ii) in any county in any state, (iii) using Drilling Rig #4, and (iv) at any time prior to repayment of all principal on the Investor Loans (referred to as "Payback")." *See* Exhibit 2 hereto at ¶ 2. The prospectus, Letter Agreement, and Participation Agreement that Mr. Johnson sent me stated that I would receive partial principal repayments whenever drilling activities commenced for a Program Well. I was also led to believe and expected to receive repayment in full of the loan principal after Sundance drilled 16 to 25 Program Wells, which Sundance represented would be completed at the approximate rate of one per month once the rig was obtained or by December 31, 2008.

5.      I understood that the repayment of the loan principal would be without monthly bank interest. Instead, I understood that I would receive a "carried working interest" of 0.50 percent per Unit in all Program Wells.

6.      I executed the Letter Agreement and Participation Agreement for one Unit in Rig Bank #4 on March 8, 2006. I sent Sundance a check in the amount of $10,000 on March 13, 2006, as a deposit for one Unit in Rig Bank #4. True and correct copies of my executed agreements and March 13 check to Sundance are attached hereto collectively as Exhibit 3.

7.      On April 5, 2006, I, along with Gordon Morrow, Charles Salter, Bradley Myers, Tom Mott, and Pat Cummiskey, traveled to Texas at the expense of Sundance. We visited Sundance's offices in Irving, Texas and Rio Vista, Texas, and I met with David P. ("Pat") Patman and Kirk Johnson while I was there. Sundance also took us from Dallas via helicopter to the Rio Vista offices and the Barnett Shale area to view the field and the drilling activity there. During our visit, Mr. Patman and Mr. Johnson represented to me that Sundance had established the Rig Bank Loan programs because of the low loan-to-value ratio at which banks were willing to finance drilling rigs. They told me that Sundance instead wanted to finance the rigs through private loans which they had set-up through the Rig Banks.

8.      On April 5, 2006, I provided Sundance a check for $640,000, representing the remaining principal amount for the one Unit in Rig Bank #4 that I agreed to lend Sundance. A true and correct copy of my check (dated April 4) is attached hereto as part of Exhibit 3.

9.      On April 7, 2006, I executed a Letter Agreement and a Participation Agreement for Rig Bank #4 and sent Sundance a check in the amount of $5,000 towards an additional 1/4 Unit loan to Rig Bank #4 in my name. That same day, I sent Sundance another check in the amount of $5,000 towards an additional 1/4 Unit loan to Rig Bank #4 in the name of my wife, Barbara Lionetta. On April 24, 2006, I sent Sundance a check in the amount of $157,500 for the 1/4 Unit loan to Rig Bank #4 that is in my name, and a separate check in the amount of $157,500 for the 1/4 Unit loan to Rig Bank #4 in my wife's name. True and correct copies of the Letter Agreement, Participation Agreement, April 7 and April 24, 2006 checks for the 1/4 Unit loan in my name are attached hereto collectively as Exhibit 4. True and correct copies of the Letter Agreement, Participation Agreement, April 7 and April 24, 2006 checks for the 1/4 Unit loan in my wife's name are attached hereto collectively as Exhibit 5.

10.    In mid-May 2006, I asked Kirk Johnson whether IRA funds could be used for Rig Bank loans. He indicated that other lenders had used IRA funds. Thereafter in June 2006, I used previously rolled-over IRA funds to establish a self-directed IRA with Pensco Trust Company to loan an additional 1/4 Unit to Sundance for Rig Bank #4. True and correct Copies of the check that I sent to Sundance through my IRA for $162,500, Letter Agreement, and Participation Agreement that I executed for an additional 1/4 Unit loan to Rig Bank #4 through my IRA are attached hereto as Exhibit 6.

11.    On June 27, 2006, my wife instructed Sundance to transfer to the 1/4 Unit loan that had been in her name to my name. A true and correct copy of her instructions to Sundance, along with the new Letter Agreement and Participation Agreement that I executed for the 1/4 Unit are attached hereto collectively as Exhibit 7.

12.    On July 31, 2006, I received a letter from Sundance that explained that the drilling rig that Sundance had purchased and financed through Rig Bank #1 would be used to drill wells for Rig Bank #4. The letter stated that using Drilling Rig #1 would "allow Principal payments to be made to you considerably sooner than would otherwise occur under normal circumstances." A true and correct copy of the July 31, 2006 letter is attached hereto as Exhibit 8.

13.    On October 6, 2006, I received a partial principal payment in the amount of $25,000 per Unit from Rig Bank #4, for a total of $37,500 which included the amounts sent to my Pensco IRA funds. According to Sundance's letter of October 6 announcing the principal payment, the well that triggered partial repayment of my loan, Stewart #2-H, was drilled on July 7, 2006. Sundance's letter represented that a second well had been drilled, but no principal payment has been made on that well. A true and correct copy of Sundance's October 6, 2006 letter is attached hereto as Exhibit 9.

-5-

14.    On December 6, 2006, Sundance Management sent me another letter announcing the drilling of a third well. The letter claimed that "[a]nother principal payment should be forth coming [sic] shortly." A true and correct copy of Sundance's December 6, 2006 letter is attached hereto as Exhibit 10.

15.    In January 2007, I received a second partial principal payment for Rig Bank #4 in the amount of $25,000 per Unit, for a total of $37,500 which included the amounts sent to my Pensco IRA funds. This second partial payment is the last principal repayment that I have received for Rig Bank #4.

16.    On January 16, 2007, I received an update on Rig Bank #4, which indicated that four wells had been drilled. The update showed that no payments had been made on the last two wells drilled. A true and correct copy of the January 16, 2007 update is attached hereto as Exhibit 12. The last information provided to me by Sundance, in February 2007, reflected that Drilling Rig #4 had been used to drill five wells. The update showed that no payments had been made on the last three wells drilled. A true and correct copy of that update is attached hereto as Exhibit 11.

17.    Sundance owes me (directly and through my IRA) a total of $900,000 in loan principal for Rig Bank #4.

18.    To date, I have not received any carried working interests for any wells in Rig Bank #4.

## Rig Bank Loan Program #6

19.    In addition to lending money to Sundance for Rig Bank #4, I also lent money to Sundance for Rig Bank #6. I received a prospectus for Rig Bank #6 from Kirk Johnson via Federal Express in August 2006. A true and correct copy of the prospectus that Mr. Johnson sent me is attached hereto as Exhibit 12. Mr. Johnson also sent me a Letter Agreement and

Participation Agreement for Rig Bank #6. A true and correct copy of the Letter Agreement and Participation Agreement is attached hereto as Exhibit 13. The materials for Rig Bank #6 appeared to me to be similar to the materials for Rig Bank #4.

20.    On September 22 and 23, 2006, I, along with Timothy Biliouris, traveled to Sundance's offices in Irving, Texas and Rio Vista, Texas at Sundance's expense. We visited Sundance's offices and viewed the wells and rigs in progress via helicopter. During our trip, I had extensive conversations with Kirk Johnson and brief discussions with Pat Patman about the Rig Bank loan program and about Sundance's liquidity. Mr. Johnson assured Timothy Biliouris and me that the cash position of the company had "never been better" and was not an issue. He stated that Sundance preferred to pay private lenders generous working interest rather than pay financial institutions high interest rates for commercial loans given the low loan to value ratio available to Sundance.

21.    Over the course of our two day visit, we repeatedly posed the same question to Mr. Johnson in a variety of different formats. The basic question was: "How safe is the loan principal in the Rig bank Loan Program?" In each instance, Mr. Johnson stated that there was essentially no risk in the Rig Bank Loan repayments. He stated that short of a natural disaster, corporate bankruptcy, or even acts of terrorism, our principal was safe and repayment was guaranteed.

22.    On September 29, 2006, I executed the Letter Agreement and Participation Agreement for Rig Bank #6 and sent them to Sundance along with a check for $162,500, representing a 1/4 Unit loan to Rig Bank #6. A true and correct copy of the executed Agreements is attached hereto collectively as Exhibit 14.

23.    On October 19, 2006, I executed another Letter Agreement and Participation Agreement for Rig Bank #6 through my Pensco IRA account. I sent a deposit payment of $122,000 to Sundance, representing a 1/5 Unit loan to Rig Bank #6. True and correct copies of the executed Agreements and IRA transfer instructions are attached hereto collectively as Exhibit 15.

24.    On January 28, 2007, I sent Sundance an additional $8,000 for the remainder of the 1/5 Unit loan to Rig Bank #6 that I lent through my Pensco IRA. A true and correct copy of my $8,000 transfer instruction is attached hereto as Exhibit 16.

25.    Also on October 19, 2006, a Letter Agreement and Participation Agreement were executed for Rig Bank #6 for my minor daughter, Jacqueline C. Lionetta. I sent a deposit payment of $10,000 to Sundance for a 1/4 Unit loan to Rig Bank #6 in Jacqueline's name. True and correct copies of the executed Agreements and my letter regarding the deposit are attached hereto collectively as Exhibit 17.

26.    On November 13, 2006, I sent a check in the amount of $130,000 to Sundance as additional funds towards the 1/4 Unit loan to Rig Bank #6 in the name of my daughter, Jacqueline. A true and correct copy of that check is attached hereto as Exhibit 18.

27.    On January 21, 2007, I sent a check in the amount of $22,500 to Sundance for the remaining balance of the 1/4 Unit loan to Rig Bank #6 in the name of my daughter Jacqueline. A true and correct copy of that check is attached hereto as part of Exhibit 19.

28.    On December 22, 2006, I received revised Letter Agreements and Participation Agreements from Sundance for each of my loans in Rig Bank #6. The revised agreements were accompanied by a letter dated December 4, 2006, which explained that non-substantive changes had been made to the agreements. True and correct copies of Sundance's December 4, 2006

letters and the revised agreements that they sent me are attached hereto collectively as Exhibit 20.

29.     On January 4, 2007, I received a letter from Kirk Johnson, stating that the drilling rig for Rig Bank #6 had been deployed to the field to drill the first well in Rig Bank #6. A true and correct copy of Mr. Johnson's January 4, 2007 letter is attached hereto as Exhibit 21.

30.     On January 7, 2007, I received an update from Cheryl Simmons, a Vice President at Sundance, that one well in Rig Bank #6 was pending drilling. In February 2007, I received another update from Ms. Simmons, indicating that one well had been completed in Rig Bank #6, and another was pending. True and correct copies of these January and February updates are attached hereto collectively as Exhibit 22.

31.     Throughout March, April, and May 2007, I began a series of conversations with Kirk Johnson as to the status of principal repayment in Rig Banks #4 and #6. Around April, Mr. Johnson told me that Shell Oil Company and Mesa Petroleum had terminated their joint ventures with Sundance. He assured me that the next principal payment would be in May or June 2007 because Sundance was working with a group "out of Houston" to obtain restructuring financing.

32.     On May 8, 2007, Sundance sent a letter to the lenders in the Rig Banks explaining that Shell and Mesa had terminated their ventures with Sundance. The letter, however, made no mention of a future principal payment. A true and correct copy of the May 8, 2007 letter is attached hereto as Exhibit 23. Alarmed at the delay in principal repayment, I began talking to Mr. Johnson and others at Sundance several times each week. Mr. Johnson assured me during our conversations that Sundance had more than enough assets to repay the Rig Bank lenders.

33.     On June 15, 2007, Cheryl Simmons, a Vice President at Sundance, sent me and the other Rig Bank lenders another letter updating us on the status of the Rig Banks. She

-9-

indicated in her letter that Sundance was attempting to replace Shell and Mesa with other investors and hoped to capitalize on that by the fourth quarter of 2007. She also stated that Sundance did not have a tentative date for any "return-on-investment payments." A true and correct copy of the June 15, 2007 letter is attached hereto as Exhibit 24.

34.    In mid-June, 2007, I was contacted by a financial consulting company that had been hired by Sundance to refinance and/or restructure the company. Through my subsequent conversations with that company, with a second financial consulting company that Sundance later hired, and with Sundance officers, I learned that Sundance was insolvent, that the drilling rigs acquired with the funds from the Rig Bank Loans were in the possession of Patman Drilling and were pledged to Merrill Lynch for approximately $28 million, that Sundance had loaned money or made cash advances to Patman Drilling, that Sundance owed approximately $500,000 to PJ Services, a company owned by Michael Patman's son, for purported water hauling services at a rate of $75 per hour, that Sundance had sold its interest in a pipeline for approximately half its value in a fire sale, and that Sundance had guaranteed the $28 million loan from Merrill Lynch to Patman Drilling. I also learned that, in addition to using the Rig Bank Loan funds to purchase drilling rigs, Sundance had used the loan funds to purchase leases, advance cash to Patman Drilling, pay general and administrative expenses, and redeem nearly $4 million in stock from Michael and Pat Patman.

35.    Throughout July, August, and early September, a series of settlement discussions ensued between Michael Patman, Kirk Johnson, and me. None came to fruition.

36.    To date, I have not received any principal payments or any carried working interests for any wells in Rig Bank #6. Sundance owes me (directly, on behalf of my daughter, and through my IRA) a total of $455,000 in loan principal for Rig Bank #6.

## Cease and Desist Order Against Sundance and its Officers

37.     I later learned that, on December 1, 2006, Sundance, Michael E. Patman, and Kirk Johnson executed and consented to the entry of a cease and desist order against them by the Texas State Securities Board for selling and offering for sale working interests in oil and gas drilling projects without registering them and without registering themselves as dealers.  The cease and desist order was entered by the Board on December 22, 2006.  A true and correct copy of that order is attached hereto as Exhibit 25.

## Necessity of Relief

38.     Sundance has failed to perform its obligations under the Rig Bank Loan Agreements or live up to the representations made to me about the loans.  On September 5, 2007, Sundance served me with a lawsuit that they filed against me in state court in Fort Worth, Texas, seeking a declaratory judgment that the Rig Bank loans were not loans.

39.     Plaintiffs seek the issuance of a preliminary injunction to prevent the further disposition or encumbrance of the assets of Sundance, including the assets that it has already transferred to its affiliate, Patman Drilling, and insiders Michael E. and David P. Patman, for less than reasonably-equivalent value and with knowledge that its remaining assets would not be enough to meet its obligations under the Rig Bank Loan Agreements and/or with actual intent to defraud Plaintiffs.

40.     If Plaintiffs' application for preliminary injunction is not granted, harm to Plaintiffs is imminent and irreparable.  If Sundance is allowed to continue to transfer its assets in fraud of the Plaintiffs while it is already unable to pay its debts as they become due or continue with drilling activity for lack of liquidity, Plaintiffs will be left without an adequate remedy at law.

41.     Plaintiffs are willing to post a bond in an appropriate amount.

-11-

42.    Further, an accounting and the appointment of a receiver are necessary to conserve the assets and business of Sundance, and to avoid damage to the Plaintiffs. Defendants have been systematically stripping Sundance of its assets, including the rigs purchased with the funds received from Plaintiffs to Patman Drilling and approximately $4 million in cash paid to the Patmans.    While Defendants continue to transfer money and perhaps other assets to themselves or their affiliated companies, Sundance has been accumulating vast amounts of unpaid debt. At present, and for some time, Sundance has been unable to meet its debts as they become due in the ordinary course of its business.    All or virtually all of Sundance's indebtedness is now past due, and Sundance has practically no cash resources and no assets that can readily be converted into cash to pay its debts.

43.    Sundance is indebted to Plaintiffs in the sum of $12,102,500, of which $1,355,000 is owed to me and my family members.

I declare under penalty of perjury that the foregoing is true and correct.


William G. Lionetta, Jr.


SIGNED on this the 17th day of September, 2007.



**Rig Bank #4 Fund**

# **S**UNDANCE *RESOURCES, INC.*

Exhibit 1

# SRI RIG BANK #4 OPPORTUNITY

# WITH CARRIED WORKING INTEREST

# PROGRAM

# FBO

## SRI's BARNETT SHALE DEVELOPMENT

## BOSQUE, ERATH, HAMILTON, HILL, HOOD, JOHNSON, SOMERVELL & PARKER COUNTIES



**SUNDANCE** RESOURCES, INC.

4925 N. OConnor Blvd.
Suite 101
Irving, TX 75062
(972) 717-7441 (800) 777-9528
Fax (972) 893-5828

Date

Account Name
Address
City, State, Zip Code

Re:    Rig Bank #4 Opportunity with Carried Working Interest Program FBO
       SRI's Barnett Shale Development, Bosque, Erath, Hamilton, Hill, Hood, Johnson
       Parker and Somervell Counties, Texas

ZJ40 Triple Derrick Drilling Rig (New)

Enclosed herewith, please find for your review and approval, an original and photo copy of
SRI's Rig Bank Opportunity, Letter Agreement and Participation Agreement to Rig Bank
Fund the following item: 1 (one) ZJ40 Triple Derrick Drilling Rig (New).

  The following represents the terms of the offer:

| | |
|---|---|
| New ZJ40/2250D Triple Derrick Rig: | ± $5,500,000.00 |
| Assembly /Transport: | $ 250,000.00 |
| Drill Pipe: | $ 500,000.00 |
| Legal and G&A: | $ 250,000.00 |
| Total: | $6,500,000.00 |
| Fund's Carried Working Interest: | 5% W.I. in and to multiple Wells |
| Payout - Term: | Return of Principal Estimate 36 Months, |
| Estimate #of wells with carried interest: | (16 to 26 plus Wells) |

Upon your approval of the enclosed documents:

  1) Please sign your name on the Letter Agreement and Participation Agreement;
     where applicable
  2) Write in your Tax I.D. Number or Social Security Number in the space provided
  3) Retain a copy of all documents for your records
  4) Deliver your check, Participation Agreement and Letter Agreement to the offices
     of Sundance Resources, Inc. (Please do not staple or tape the check)

If you should have any questions, do not hesitate to contact me at 972-717-7441 or 800-
777-9528.

Sincerely,

D. Kirk Johnson Sundance
Resources, Inc.

# TABLE OF CONTENTS

1) INTRODUCTION – SUMMARY

2) LETTER AGREEMENT & PARTICIPATION AGREEMENT

3) ECONOMICS (CARRIED WORKING INTEREST)

4) RIG PHOTOGRAPHS

5) DRILLING RIG CONSTRUCTION CONTRACT / INVENTORY

6) RIG #4 DEPLOYMENT / PLANS

7) MAP – LEASES

8) JOHNSON, PARKER & TARRANT COUNTIES HORIZONTAL PRODUCTION DATA

9) SUPPORTING NEWS ARTICLES, PRESS AND PERIODICAL INFORMATION

1



# $\mathbf{S}$UNDANCE RESOURCES, INC.

4925 N. O'Connor Blvd.
Suite 101
Irving, TX 75062
(972) 717-7441 (800) 777-9528
Fax (972) 893-5828

---

**PROGRAM HIGHLIGHTS**
**SRI Barnett Shale Development - Rig Bank #4 Opportunity**
**Rig Bank Finance Opportunity / Carried Working Interest Program**

**Program**
Rig Bank #4 Funding with Direct Carried Working Interest Ownership to be delivered in and to multiple Barnett Shale Wells: Estimated number of Wells = 16 to 25 plus…

**Size**
$6,500,000 (to finance a New ZJ40/2250D Triple Derrick Drilling Rig)

Oil/Gas Industry style Rig Bank Financing / Prospect Development Funding, delivering returns via Long Term Income from a Direct Carried Working Interest basis in all Barnett Shale Wells drilled by SRI or any other Operator with the aforementioned Rig being purchased by PBD, LP (an SRI subsidiary) until payment of original principal to Rig Bank Fund #4 in full is made

**Structure**
Rig Bank Financing with SRI and delivery of Carried Working Interest to participants

**Activities**
Capitalization and Financing of one (1) high quality Drilling Rig. The Program will deliver a Carried Working Interest of 5% to Rig Bank Participants (.50% W.I./.375% N.R.I. per Unit) on all Wells drilled by said Rig by SRI or any other operator in the Barnett Shale Play until payment in full of Principal is returned to Fund Participant(s). Estimate 16 to 25 plus Wells

**Drilling & Completion**
Wells to be drilled on SRI acreage will be drilled and completed on a Turnkey fixed cost basis with no direct costs of the Carried Working Interest to the Fund Participants

**Revenues**
Partial Principal Returned to Fund and Participants after each Well drilled, ($200,000 to $500,000 per Well) plus 5% Carried Working Interest (.50% W.I./.375% N.R.I. per Unit) in multiple Wells paid to Investor/Rig Bankers in all Wells drilled by said Rig until the original investment amount is returned.

**Distribution**
Principal payments plus a Carried Interest to be distributed ± 30 days after the drilling of each Well or Prospect and Working Interest Revenues to be paid ± 60 days after the Well(s) have been completed and placed into production (.50% W.I./.375% N.R.I. per Unit)

**R.O.I.**
Potential Return on Investment, ranging from the Return of Principal up to an estimated additional ± $22,000,000 in Working Interest Revenues from potentially twenty (25) 3 BCF Wells @ $8.00 gas, with long term Working Interest Income and profits; the core of the Fund's objectives

**Experienced Operator/Sponsor**
SRI has over 23 years experience in the Oil and Gas Exploration/Production Business and has drilled in excess of 157 Wells, successfully completing ÷77%

2



4925 N. O'Connor Blvd.
Suite 101
Irving, TX 75062
(972) 717-7441  (800) 777-9528
Fax (972) 893-5828

## LETTER AGREEMENT

This Letter will serve as acknowledgement and binding agreement by and between **FORMAL ACCOUNT NAME** ("Investor") whose address is **MAILING ADDRESS** and SUNDANCE RESOURCES, INC. ("SRI*)* whose address is 4925 N. O'CONNOR BLVD. SUITE 101, IRVING, TX 75062 (mailing address: P.O. Box 459, Rio Vista, TX 76093)

## RECITALS

(A)  SRI is offering prospective investors who meet the suitability and other requirements of SRI, the opportunity to purchase Units in SRI's Rig Bank #4 Funding Program. The Rig Bank #4 Program will consist of a total ten (10) Units, with each Unit costing $650,000, and the aggregate of all Units totaling $6,500,000.

(B)  Each "Unit" shall consist of (i) a non-interest bearing obligation on the part of the Program and SRI to repay the Unit holder his or her loan to the Program in the amount of $650,000 per Unit ("Investor Loan"), and (ii) a carried working interest in all Program Wells (as defined below) drilled by SRI (or any other party contracting to use Drilling Rig #4) prior to repayment in full of each Investor Loan.

(C)  Proceeds from the sale of Units, totaling $6,500,000 if all ten (10) Units are sold, will be utilized by SRI for its acquisition (including title, legal and associated expenses) of a New ZJ40/2250D Triple Derrick Electric Drive Rig ("Drilling Rig #4"). (See attached photos and Rig Equipment Inventory Sheet).

(D)  Each Unit costs $650,000.  This Letter Agreement assumes that all ten (10) Units will be sold, and all references herein to the aggregate amount of working interest and net revenue interest to be allocated to participants in this Program are based on such assumption.

## AGREEMENT

1.     Investor will advance $650,000 per Unit to the Program contemporaneously with the execution of this Letter Agreement and the Private Placement Participation Agreement attached hereto. The proceeds of all Investor Loans will be loaned to SRI and used to acquire Drilling Rig #4. No management or other expenses will be paid from the Investor proceeds.

2.     Each Investor Loan will be repaid to the Investor as each Program Well is drilled. A "<u>Program Well</u>" means an oil and/or gas well having all of the following characteristics: (i) drilled by SRI (or any other operator), (ii) in any county in any state, (iii) using Drilling Rig #4, and (iv) at any time prior to repayment of all principal on the Investor Loans (referred to as "<u>Payback</u>"). After Payback, there will be no additional Program Wells, but each Investor will retain its pro rata share of Carried Working Interests assigned in Program Wells until the date of Payback. "Drilled" means the commencement of drilling activities (*i.e.*, spudding of the well), regardless of when drilling is completed or when the well is completed.

3.     Each Investor shall receive a .50% "<u>Carried Working Interest</u>" per Unit (5% for the entire Program) in all Program Wells. The Carried Working Interest shall be subject to its proportionate share of lease burdens totaling an aggregate of 75%, thus yielding a .375% Net Revenue Interest per Unit (3.75% for the entire Program) in all Program Wells.

4.     SRI estimates that it will take between 16 and 26 Program Wells to return the Investor's Loan principal in full, though actual repayment could occur based on a lesser or greater number of Program Wells.

5.     Neither this Program nor the Investors in this Program will acquire title to the Program Prospects covered by the Program Wells. The 5% Working Interest/3.75% Net Revenue Interest of Investor(s) shall be a "Carried Working Interest". SRI and its successors and assigns (but not the participants in this Program) will bear and pay the costs of drilling, completing and equipping (through the wellhead and tanks) the Program Wells. Each Investor will then bear his or her proportionate share of Working Interest Costs on any Program Well incurred <u>after</u> completion and the installation of the "Christmas Tree" at the wellhead. All operations on the leases shall be conducted under the terms of the Operating Agreement negotiated between SRI and its successors and assigns in the ownership of the leases, and Investor agrees to be bound by the form of Operating Agreement executed by the parties bearing the expense of drilling all Wells on the leases or land pooled therewith. SRI shall have the right to execute pooling declarations covering the leases and the Investor's interest in the Program Well leases shall be subject to any such pooling.

6.    The Unit proceeds will be loaned to SRI for the purchase of Drilling Rig #4. Neither the Program nor any Investor will acquire title to Drilling Rig #4, nor will any Investor be responsible for any repair, replacement, maintenance or any other cost associated with Drilling Rig #4, all of which will be the responsibility of SRI as the owner of the equipment.

This Agreement, together with the accompanying Participation Agreement, will supercede all others previously entered into.


Signed and acknowledged this _____ day of _____, 200___.



SUNDANCE RESOURCES, INC.          INVESTOR


_____            _____
MICHAEL E. PATMAN                FORMAL ACCOUNT NAME
PRESIDENT / CEO

Exhibit "D"

# PARTICIPATION AGREEMENT

## RIG BANK #4 FUNDING PROJECT

## BARNETT SHALE DEVELOPMENT
## BOSQUE, ERATH, HAMILTON, HILL, HOOD, JOHNSON, PARKER & SOMERVELL COUNTIES LEASES AND PROSPECTS

### BOSQUE, ERATH, HAMILTON, HILL, HOOD, JOHNSON, PARKER & SOMERVELL COUNTIES, TEXAS
### (TARGETED COUNTIES FOR FUTURE HORIZONTAL BARNETT SHALE PROSPECT DEVELOPMENT)



# PARTICIPATION AGREEMENT

Sundance Resources, Inc.
4925 N. O'Connor Blvd.
Suite #101
Irving, TX 75062

Re:  Rig Bank #4 Funding Program
     SRI Barnett Shale Development Leases and Prospects

Gentlemen:

This agreement, when signed and accepted by Sundance Resources, Inc. as Sponsor, shall constitute the terms of participation in the SRI Rig Bank #4 Funding Program. I acknowledge having received a copy of the Program's confidential information and proposal dated January 30, 2006 (Rig Bank Offer). Capitalized terms used herein and not otherwise defined shall have the meaning assigned to the Rig Bank #4 Funding Program as set forth in the Letter Agreement or elsewhere in the Rig Bank Offer.

I have thoroughly reviewed the Rig Bank Offer and desire to purchase the number of Units in the Program set forth in Section III. In consideration of the terms of the Units described in the Rig Bank Offer and the covenants set forth below, I accept and agree to be bound by the following:

I.   PROSPECTS:
     In exchange for its receipt of Investor Loan proceeds, Sundance Resources, Inc. (hereinafter referred to as "SRI") will commit to drill or otherwise develop horizontal wells, leases and acreage prospects in the Barnett Shale in North Central Texas and will acquire a New ZJ40/2250D Triple Derrick Electric Drive Drilling Rig (See attached detailed description and photos) for use in such development.

     Investors in the Program will receive the right to be repaid the principal of its Investor Loan and will also receive a Carried Working Interest in each Program Well drilled with Drilling Rig #4, as described in more detail in Section IV.

     Each prospect on which a Program Well is drilled (and a portion of the Carried Working Interest assigned on each completed well to Investors in this Program) will be referred to as a "Program Prospect".

     I acknowledge that SRI or its affiliates will continue to undertake oil and gas drilling and other exploration activities outside of this Program, and that Investors in this Program will not acquire any rights in and to any other SRI activities which are outside the activities and interests of this Program. I agree that SRI may acquire or contract other drilling rigs and prospects in the North Central Texas area, including in Bosque, Erath, Hamilton, Hill, Hood, Somervell, Johnson and Parker Counties. I understand such leasing, drilling and completion activities are at the sole discretion of SRI. I also acknowledge that SRI, in its capacity as Sponsor of this Program, will make all the

RIG BANK #4 FUNDING PROJECT
SRI BARNETT SHALE DEVELOPMENT LEASES AND PROSPECTS
BOSQUE, ERATH, HAMILTON, HILL, HOOD, JOHNSON, PARKER &
SOMERVELL COUNTIES, TEXAS
Page 2

decisions concerning future lease acquisitions and drilling prospects and that I will not have an opportunity to review or approve any future prospect candidates.

II.    ACREAGE ACQUISITION AND DEVELOPMENT:

SRI will continue to evaluate and lease what it believes to be high quality oil / natural gas leases in the Barnett Shale area. SRI will endeavor to have purchased and then subsequently sold or assigned all Program Prospects to drilling ventures or third parties by **December 31, 2008**. Most, if not all, of the Program Prospects may be assigned to SRI Sponsored Drilling Ventures, for which SRI will likely, but not necessarily, serve as Operator. I understand the dual capacity in which SRI may be functioning, and I accept the conflicts of interests inherent in such arrangement. In most cases, SRI (or any other program sponsor) will retain for the benefit of itself and the investors in the drilling programs certain carried working interests and/or overriding royalty interests (ORR) in each prospect. This Program contemplates that, except for unusual Program Prospects, all drilling and completion activities relating to the Program Wells will be undertaken by an SRI-sponsored drilling venture or a drilling venture organized by a third party entity. In each case, such drilling venture will be outside of this Program.

I also acknowledge the conflict of interest SRI may have in deciding whether to use Drilling Rig #4, or one of the other drilling rigs owned by SRI or an affiliate, on a particular prospect, some or all of which other rigs may have also been purchased through rig bank funding programs such as this. I understand that SRI has agreed not to unreasonably favor one drilling rig over another, but to assign Drilling Rig #4 and its other drilling rigs to its various prospects as equitably as possible taking into consideration such factors as, among others, the need to diversify Program Prospects among various lease acreage so as to enhance the possibility that all of SRI's drilling programs might share in SRI's better prospects. I acknowledge and understand that SRI's assignment of rigs among prospects will be at SRI's sole and absolute discretion.

III.    LEASE / WELL PARTICIPATING INTERESTS:

In consideration of the agreement of SRI to acquire and be wholly responsible for Drilling Rig #4, and for it to drill and develop the Program Wells for which it will assign the Carried Working Interests, I agree to pay the Unit cost, as set forth below, which includes a Unit's share of the costs to acquire Drilling Rig #4. The cost of each Unit is $650,000.00. Total Units available = Ten (10).

UNITS: _____ @ $ _____ ($650,000 PER UNIT)

TOTAL: $ _____

IV.    CARRIED WORKING INTEREST AND LOAN REPAYMENT:

SRI will acquire and deliver to the Program investors a Carried Working Interest in Leases having a minimum 75% Net Revenue Interest. SRI will attempt to acquire the highest possible Net Revenue Leases and will deliver to Participants in this Program an aggregate 5% Carried Working Interest/3.75% Net Revenue Interest (assuming a sale of all ten (10) Units) in all Program Wells. SRI may make assignments of the Working

Interests in a Program Well directly to Participants in this Program and to other participants in the drilling program. The Carried Working Interest assigned to the Participants in this Program will continue for the life of the Program Wells.

In addition to the Carried Working interest, SRI (or the Program) will make partial repayment of my Investor Loan each time Drilling Rig #4 is used to drill a Program Well. The average of all partial repayments will be a minimum of $25,000 (per Unit) and a maximum of $75,000 (per Unit). SRI will determine, at its sole discretion, the amount of each partial repayment within the minimum and maximum averages stated. [This means that SRI may repay the Investor Loan principal after as few as nine (9) Program Wells or as many as twenty-six (26) Program Wells.] When the principal of the Investor Loans has been repaid (referred to as "Payback") SRI will no longer assign Carried Working Interests to participants in this Program in any new wells drilled after that date. All Carried Working Interests assigned to Participants prior to Payback will continue for the life of each Program Well.

V.  SPECULATIVE NATURE OF INVESTMENT:

I recognize the speculative nature and risks of loss in oil and gas exploration.

I also recognize the risk of loss associated with the acquisition of large, expensive, single-purpose types of equipment, such as Drilling Rig #4. Accordingly, I acknowledge the following risk factors as some of the risks inherent in this Program:

- If Drilling Rig #4 has equipment failures, it could be out of use for extended periods of time, thus negatively impacting the repayment of my Investor Loan and Carried Working Interest.
- If the price of natural gas experiences a significant decline, the demand for Drilling Rig #4 could subside, also negatively impacting my Investor Loan and Carried Working Interest.
- The Investor Loan will be a general unsecured obligation of the Program and SRI, thus any material financial events negatively impacting SRI could, and likely would, negatively impact the Investor Loan and the Carried Working Interest.
- If Drilling Rig #4 is damaged or destroyed beyond repair, it may be salvaged and any salvage proceeds together with any insurance proceeds returned to investors, in which case there would be no Program Wells and no Carried Working Interests assigned after such rig damage or destruction.

In view of all the risks attendant to an investment in this Program, I acknowledge and understand that: (i) I could possibly suffer a complete loss of my Investment; (ii) I will not have limited liability as a working interest owner in the Carried Working Interest assigned to me; and (iii) I will be liable for my proportionate working interest share of all costs, expenses and liabilities incurred in connection with the operation of each Program Well once production is established. Further, I warrant and represent that I am acquiring an Interest in this Program solely for my own account for investment purposes and not with any view to or for resale in connection with any distribution of securities as defined in the applicable securities laws and rules and regulations thereunder. I am aware of and

further, that I have had sufficient opportunity to make inquiry of SRI with respect to the interest in this Program, that any information so requested has been furnished and that I have had the opportunity to verify such information. I have specifically read and reviewed the conflicts of interest described herein and/or in the Letter Agreement, and I have decided to make my Investment in the Units with full knowledge of such conflicts.

VI      Pursuant to my acceptance as a qualified Investor in the program, and as a Carried Working Interest Investor in the project, **I UNDERSTAND AND ACKNOWLEDGE BY <u>INITIALING ONE OF THE FOLLOWING</u>:**

--------

(INITIAL)       I am an Accredited Investor as that term is defined by the SEC with my Net Worth or Joint Net Worth with my spouse exceeding $1 million.

                                                or

--------

(INITIAL)       I have had income in excess of $200,000 in each of the two most recent years and reasonably expect income in excess of $200,000 in the current year, or together with my spouse have had income in excess of $300,000 in each of the two most recent years and reasonably expect income in excess of $300,000 in the current year.

If I do not fall within at least one (1) of the two categories above, meaning that I am a Non-Accredited Investor as that term is defined by the SEC, I am not eligible to participate in this Program.

VII.    ACCEPTANCE OF TERMS AND CONDITIONS

The terms, covenants and conditions hereof shall extend to and be binding upon the parties hereto, their successors and assigns. This instrument shall not be assigned by you either in whole or in part unless you have first obtained written consent from SRI, which may be given or withheld in the sole discretion of SRI.

The foregoing sets forth the entire agreement between the parties with regard to the subject matter hereof, and there are no oral or other agreements (other than the Letter Agreement accompanying this Agreement) between the parties not set out herein in writing. If either party desires to amend this agreement, then an instrument in writing executed by both parties hereto shall accomplish such amendment.

If any provision herein is in conflict with the Joint Operating Agreement, then the provision herein shall prevail.

It is further understood that no guarantee of production, rate of return or production has been made by SRI, its affiliates, employees, officers or consultants and that "The Participant" or "Investor" is not relying upon any such guarantee or representation regarding the purchase of a Unit that contemplates the assignment of Carried Working Interests.

RIG BANK #4 FUNDING PROJECT
SRI BARNETT SHALE DEVELOPMENT LEASES AND PROSPECTS
BOSQUE, ERATH, HAMILTON, HILL, HOOD, JOHNSON, PARKER &
SOMERVELL COUNTIES, TEXAS
Page 5

It is further understood that no guarantee of production, rate of return or production has been made by SRI, its affiliates, employees, officers or consultants and that "The Participant" or "Investor" is not relying upon any such guarantee or representation regarding the purchase of a Unit that contemplates the assignment of Carried Working Interests.

**Sundance, as Sponsor/Operator, is evaluating and attempting to acquire  other Leases in the immediate area(s), SRI will reserve the right to change the proposed drilling location(s) of any planned Program Well should the management of SRI feel a change to be in the best interest of Potential Reserves, Production and Return On Investment of the Prospects.**

If the terms and conditions herein set forth meet with your approval, please indicate your approval and acceptance by signing this agreement in the space provided below and return one (1) copy to SRI's office.

This agreement has been executed in duplicate, each of which shall constitute an original.

Very truly yours,

_____          _____
**Signature of Investor or Trustee**              **Print Name**

_____
**Formal Account Name**
*(Must Be Filled Out How Your Account and Revenue Checks Should Read)*

_____
**Tax I.D. or Social Security Number**

_____
**Mailing Address**

_____
**City, State, Zip Code**

_____    _____    _____
**Home Phone Number**          **Work Phone Number**          **Cell Phone Number**

_____
**E-Mail Address**

*BELOW FOR "SRI" USE ONLY*

**DO NOT WRITE IN THIS SECTION**

APPROVAL AND ACCEPTANCE

AGREED TO AND ACCEPTED THIS _____ DAY OF _____, 2006.

_____
D. KIRK JOHNSON
EXECUTIVE VICE PRESIDENT
SUNDANCE RESOURCES, INC.

3

# **S**UNDANCE RESOURCES, INC.

4925 N. O'Connor Blvd.
Suite 101
Irving, TX 75062
(972) 717-7441 (800) 777-9528
Fax (972) 893-5828

## ECONOMIC SUMMARY

The Rig Bank #4 capitalization is $6,500,000 or 10 units at $650,000 each. Recovery of Principal is generated through the funding of Working Interests in oil/gas Drilling Programs in the Barnett Shale, including leases Bosque, Erath, Hamilton, Hill, Hood, Johnson, Parker, and Somervell County Leases and Drilling Programs. The Return of Capital for the Rig Bank Investor is based on every Program Well drilled by SRI in any county with the Rig #4 being purchased. It is not Lease specific. (See attached Leasehold Data and Map). See the Participation Agreement for a discussion of Program Wells.

Disbursements or the Return on Principal will be a minimum $25,000 per Unit / $250,000 total (per Well/per $650,000) until 100% of Principal is returned. In addition to the Return of Principal, .50% Carried Working Interest per Well drilled will be assigned per Rig Bank Unit for a total of 5% Working Interest per Well to the Fund participants as a whole.

Several assumptions can be made regarding Well interest accrued and a dollar value or cost basis assigned to that interest. To illustrate, we have based the following assumption discussion on the Southwest Lake Cleburne Prospect. Based on the Southwest Lake Cleburne Prospect (7000' Vertical and 3000' Horizontal Well), a 32 Unit Program (2.5% Working Interest and 1.875% Net Revenue Interest) per Unit cost = $87,500 or $2,800,000 per Well.

$87,500 (2.5% Unit cost) divided by 5 (2.5%/.50% Rig Bank Unit) = $17,500; *i.e.*, the cost value per .5% Working Interest assigned per Rig Bank #4 Unit. This Interest multiplied by the 10 Units available totals $175,000 of assigned Carried Interest per Well to the Fund's Participants.

Based on a minimum $25,000 Disbursement per Rig Bank Unit per Well drilled, the following assumption can be made: $650,000 divided by $25,000 equals 26 Wells for payback of Principal with .50% Carried Interest per Well valued at $17,500 each, multiplied by 26 Wells equals $455,000 worth of Carried Interest cost value per Rig Bank #4 Unit.

The real Return on Investment should be the production from the Wells. Based on assumed production figures of 1,000 mcf per day (See attached Area Johnson Production Figures) x $8.5 0 per mcf x 30 days = $255,000 per month x .50% Working Interest x 75% Net Lease = $956.25 per month x 26 Wells = $24,862.50 per month per Unit x 12 months of production = $298,000 per year per Unit x 10 Units available = $2,980,000 gross income per year to the Fund.

SRI's overall planned drilling schedule for the next year is up to 60 Horizontal Wells in this area and is as follows: 3 to 6 Wells are planned for January 2006 and beyond. Capitalization for 75% of all of these Wells is currently in place via SRI's agreements with Mesa and Shell. 100% Pay Out on the Rig Bank #4 Investment should be +/- 2 to 3 years on the Principal plus the additional Carried Working Interest in all Wells drilled by said rig until principal is returned. The Carried Interest will remain with the Investors/Fund participants.

# RIG BANK #4 FUND
# BARNETT SHALE DEVELOPMENT PROJECT
# MULTIPLE HORIZONTAL WELLS
# ECONOMIC ANALYSIS @ $8.50 GAS

| TOTAL MCF PER DAY PER WELL | PERCENTAGE PER UNIT | | MONTHLY INCOME 25 WELLS | | ANNUALIZED CASH FLOW |
|---|---|---|---|---|---|
| | WI | NRI | $650,000 - 1 UNIT | $1,300,000 - 2 UNITS | $650,000 - 1 UNIT |
| 2000 | 0.50% | 0.3750% | $44,101.56 | $88,203.13 | 81.42% |
| 1000 | 0.50% | 0.3750% | $21,988.28 | $43,976.56 | 40.59% |
| 500 | 0.50% | 0.3750% | $10,931.64 | $21,863.28 | 20.18% |

| TOTAL MCF PER DAY PER WELL | PERCENTAGE PER UNIT | | MONTHLY INCOME 20 WELLS | | ANNUALIZED CASH FLOW |
|---|---|---|---|---|---|
| | WI | NRI | $650,000 - 1 UNIT | $1,300,000 - 2 UNITS | $650,000 - 1 UNIT |
| 2000 | 0.50% | 0.3750% | $35,256.25 | $70,512.50 | 65.09% |
| 1000 | 0.50% | 0.3750% | $17,565.63 | $35,131.25 | 32.43% |
| 500 | 0.50% | 0.3750% | $8,720.31 | $17,440.63 | 16.10% |

| TOTAL MCF PER DAY PER WELL | PERCENTAGE PER UNIT | | MONTHLY INCOME 16 WELLS | | ANNUALIZED CASH FLOW |
|---|---|---|---|---|---|
| | WI | NRI | $650,000 - 1 UNIT | $1,300,000 - 2 UNITS | $650,000 - 1 UNIT |
| 2000 | 0.50% | 0.3750% | $28,180.00 | $56,360.00 | 52.02% |
| 1000 | 0.50% | 0.3750% | $14,027.50 | $28,055.00 | 25.90% |
| 500 | 0.50% | 0.3750% | $6,951.25 | $13,902.50 | 12.83% |

**MCF = THOUSAND CUBIC FEET**

**25** 25 WELLS
**20** 20 WELLS
**16** 16 WELLS

**These estimates assume Severance Tax of 7.5%, a monthly operating expense of $2,500 per Well.
Actual Operating Cost may be higher or lower.

The above economic analysis is intended only as a projection of what income may be expected under certain assumed conditions. Actual results will differ. This analysis should not be relied upon for any purpose other than an illustration of income and tax savings that may be realized under certain conditions.

4









5

5

BEIJING AFTHONIA, INC

# CONTRACT

**Contract No.:  001**

**Date:   December 13, 2005**

Seller:  Beijing Afthonia, Inc.

Telephone:   0086-531-86912636

Fax: 0086-531-86129100

E-mail: bm_wang81211@yahoo.com

(U.S. Office) Telephone:   1-972-495-8548

Manufacturer: Shengli Highland Petroleum equipment Co., Ltd

Telephone: 86-546-8835808; 8835800

Fax: 86-546-8835800

E-mail: slhl01@163169.net;

**Buyer:**

**Telephone: 1-972-8471161**

**Fax: 1-972-847-1164**

**E-mail: energydrilling@earthlink.net**

This Contract is between Beijing Afthonia, Inc. (hereafter referred to as "*Seller*"), whose principal place of business is 1-2D Building 3, Madian Guancheng Beiyuan, HaiDian District, Beijing, China, and Patman Brothers Drilling LLP whose principal place of business is 304 N. Highway 174, P.O. Box 459, Rio Vista, Texas 76093 (hereafter referred to as "*Buyer*"). Buyer and Seller are hereafter jointly referred to as "the *Parties*").

## 1.     SUBJECT OF THE CONTRACT

1.1.     Seller agrees to deliver 10 units of drilling rig systems, (hereafter the "*Goods*"), made by **Shengli Highland Petroleum Equipment Co., Ltd**   (hereafter the "*Manufacturer*"), to Buyer, FOB Qingdao, China.

1.2.     Detailed specifications of the Goods and quantities to be delivered are listed in the attached Technical Contract with Manufacturer attached as Exhibit A (hereafter the "*Specifications*").

## 2.     TOTAL COST OF THE CONTRACT

2.1. The total cost of the first rig to be delivered is denominated in United States Dollars and is disclosed in a separate agreement, "Total Cost for Contract No. 001" dated December 13, 2005, signed between Buyer and Seller and the terms of payment are specified in the Delivery and Payment Schedules attached as Exhibit B (hereafter the "*Schedule*").

1394753_4.DOC

The Schedule lists additional rigs but Buyer is not obligated to buy additional rigs in the absence of an additional agreement that specifies the cost of each such additional rig. ~~Any the~~ *THE ORIGINAL F $500,000* ~~of the~~ "down payments" required by the Schedule shall be made to Manufacturer, and all other payments required by the Schedule shall be made to Seller.

## 3. TERMS OF DELIVERY

3.1. The Goods shall be delivered in accordance with the Delivery and Payment Schedules attached as Exhibit B (hereafter the "*Schedule*"). In the event any rig referred to on the Schedule is delivered more than 60 days after the delivery date specified for that rig on the Schedule, the total amount due for that rig shall decrease by 10% of the original contract price, and the original contract price for such rig shall decrease by an additional 10% for each additional 30 days (or part thereof) by which the delivery is delayed beyond the delivery date for that rig specified in the Schedule.

3.2. Seller shall give Buyer fifteen days written notice prior to any shipment and Buyer shall have the right to inspect each shipment before it is loaded on a vessel for shipment. Shipment ahead of the dates specified in the Schedule is permitted only with Buyer's written permission.

## 4. WARRANTY OF THE GOODS

4.1. Quality of the Goods shall comply with API (American Petroleum Institute) standards and terms of the Specifications and the Quality Warranty attached hereto as Exhibit C (herafter the "*Warranty*"). Without limiting the foregoing, Manufacturer warrants the quality of the goods against manufacturing defects and according to the Warranty.

4.2. The warranty periods and other limitations on the warranties for the Goods are specified in the Warranty.

## 5. PAYMENT TERMS

5.1. The due date for payments are stated in the Schedule.

5.2. Seller shall deliver the Goods to Buyer with the following accompanying documentations:

- Invoice identifying Contract Number and cost of the Contract – 1 original
- Packing list - 1 original
- Certificate of Origin – 1 original
- Factory Certificate of quality - 1 original
- Customs declaration for export – 1 copy
- Bill of lading
- Any other documents required for export from China
- Any other documents required for import into the United States

5.3. Bank details of Seller:

Company Name:

Bank Name:

Account No:
Bank Address:
Tel:
Email:

## 6. WARRANTY CLAIMS
6.1. Claims made under the Warranty must be made in accordance with the terms of this Contract and the Warranty.

## 7. FORCE MAJEURE
7.1. The Parties shall be released from responsibility for partial or complete default of this contract if the fulfillment of this contract was rendered impossible by force majeure circumstances such as Acts of God, floods, fires, earthquakes, wars or military operations en route from the factory to the destination port, as well as government regulations or decrees which come into force after conclusion of this Contract.

## 8. ARBITRATION
8.1. All disagreements and conflicts pertaining to this Contract shall first be resolved by the Parties in friendly negotiations between senior management of the parties      .
8.2. Any dispute, controversy or claim arising our of or in connection with this contract, or the breach , termination or validity thereof, which have not been resolved under Clause 8.1 within thirty (30) days after written notice from one party to the other party, shall be finally settled by arbitration in accordance with the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce.
8.3. The place of arbitration shall be Stockholm, Sweden.
8.4 The arbitral tribunal shall be composed of three arbitrators.
8.4. The language to be used in the arbitral proceedings shall be English.
8.5. The decision of the arbitration panel shall be final and binding for both Parties. Judgment on the award may be entered in any court having jurisdiction thereof.
8.6. Arbitral expenses shall be borne by the defeated Party.
8.7. During the course of any negotiations or arbitration, the parties remain obligated to fulfill all terms of the contract.

## 9. VALIDATION PERIOD
9.1. This Contract takes effect from the date of technical contract signature and is valid until the complete fulfillment of obligations of the Parties hereof.

## 10. OTHER TERMS
10.1. This Contract may be changed, amended or modified only in writing and with execution and signature of the Parties.
10.2. Neither Party may assign or transfer this contract to a third party without the written consent of the other Party, except that Buyer may assign its rights to third parties, including financiers, so long as no such assignment relieves Buyer of any of its obligations under this Contract.

10.3. The cost of this Contract may be changed by mutual agreement in the event buyer desires to modify the quantity and/or technical specifications of the Goods.

10.4. This contract supersedes all previous correspondences and communications.

10.5. In the event of the existence of multiple versions of this contract, the most chronologically recent version shall prevail.

10.6. Attachments to this contract are an integral part of this Contract and have equal validity as the text in the Contract.

10.7. The Parties mutually declare that the terms in this Contract shall be treated as confidential, and neither Party may disclose the terms to any third party without the written consent of the other Party. Either Party will have the right to seek legal recourse from the other party for damages suffered as a result of breach of confidentiality by the other party.

10.8. This Contract shall be executed in English in quadruplicate (four copies), two copies to each Party. All four copies will have equal legal validity.

10.9 Buyer shall have the right to inspect the Goods at all stages during the manufacture and assembly, and Manufacturer and Seller shall provide access to their respective premises for this purpose during normal business hours.

10.10 If any rig does not meet the Specifications, Buyer may terminate its obligations with regard to all subsequent rigs and receive a refund of any down payments made with regard to any rigs not previously delivered.

**11. LANGUAGE**

11.1. For the purpose of enforcement of this Contract, the English version will supersede the Chinese version.

**12. LAW**

12.1 This contract shall be governed by the substantive law of the State of Texas (USA), without reference to the conflicts of law provisions thereof.

**Agreed to on the 13th day of December, 2005**

**Buyer:**                                                    **Seller:**

**Patman Brothers Drilling LLP**              **Beijing Afthonia, Inc.**

Gene Durkee                                            Name: *Bao Min Wang*
Vice President, Drilling Operations       Title: *President*

Seller's obligations to perform under this contract is hereby guaranteed by the Manufacturer.

Guarantor:

_____

Name:

Title

To Mr Mei.

 胜利油田高原石油装备有限责任公司
**Shengli Oil Field Highland Petroleum Equipment Co., Ltd**

# Quality Guarantee Letter

This is to acknowledge and confirm that we, SHENGLI OIL FIELD HIGHLAND PETROLEUM EQUIPMENT CO., LTD, having its registered office at No.739 Dong Er Road DongYing City, Shandong Province People's Republic of China, as a manufacturer of Drilling rig, guarantee we can manufacture the Drilling rig in according with API standard, (API Spec 4F, 7k, 8A). and the Quality management system control in compliance with the API Q1 and ISO 9001:2000.

AUTHORIZED SIGNATURE

Zheng shui rong

Vice-General Manager

SHENGLI OIL FIELD HIGHLAND PETROLEUM EQUIPMENT CO., LTD

No.739 Dong Er Road DongYing City, Shandong Province, People's Republic of China 257091

# Industrial Park of Highland






# Drilling Rig

From the year 1994 on, the factory has designed and produced 12 kinds of drilling rigs (from ZJ20 to ZJ70) and made the mechanical, compound drive, DC drive and AC VFD drive drilling rigs become serial products. These drilling rigs meet the full requirements of drilling 1500m—7000m depth well with high adaptability and performance, and are well received by the customers.

We have the capability of manufacturing 30 rigs per year.



# ZJ40/2250D Drilling Rig

## Shengli Oil Field Highland Petroleum Equipment Co. Ltd

# ZJ40/2250D Main Technical Parameters

| | |
|---|---|
| Nominal Drill Depth | 15,000 feet – 4 ½ inch drill pipe |
| | 13,500 feet 5 inch drill pipe |
| Max. Hook load | 2250kN |
| Rated power of Drawworks | 1200KW ( 1100 kW ) |
| Traveling system | 5 Block × 6 Crown Sheaves |
| Wire line Dia. | 1 ¼ inch |
| Max. fast line force | 280kN |
| Drawworks speeds | Four |
| Brake mode | Dynamic braking |
| Parking brake | Hydraulic Disc Brake |
| Rotary table | ZP275 |
| Rotary table steps | Electric Drive , DC Drive |
| Mast type / Height | K Type – 145 feet |
| Substructure Type | Slingshot or Swing up |
| Height of Drilling floor | 24 Feet |
| Power drive model | AC-DC-AC |
| Diesel Generator | CAT3508B |
| Diesel engine power x No.s | 1000 HP (3 each) |
| Drilling pump Model | 1300 HP triplex x 2 |